**03-23396**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CIV-LENARD**

CASE NO.

MAGISTRATE JUDGE
SIMONTON

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

TWENTY SIX THOUSAND DOLLARS
($26,000.00) IN U.S. CURRENCY,

       Defendant.
_____/



## VERIFIED COMPLAINT FOR FORFEITURE

Plaintiff, United States of America, hereby files this civil complaint for forfeiture *in rem* and states as follows:

1. This is a civil action for forfeiture in rem of the defendant twenty six thousand ($26,000.00) dollars in United States currency (hereinafter "the defendant currency") for violations of 18 U.S.C. §§ 1956 and 1957 pursuant to 18, U.S.C. § 981(a)(1)(A), for violations of 31 U.S.C. § 5313 (a), pursuant to 31 U.S.C. §5317 (c)(2) and pursuant to 21 U.S.C. § 881(a)(6), as monies furnished in exchange for a controlled substance in violation of the federal narcotics laws and proceeds traceable to such exchanges.

2. This Court has jurisdiction over this action under 28 U.S.C. §§ 1345 and 1355.

3. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §§ 1355 (b)(1), 1355 (b)(2) and 1395 because the defendant currency was seized in the Southern District of Florida and will remain in this District throughout the pendency of this action.



## **BACKGROUND ON COLOMBIAN BMDPE**

4. This case involves the laundering of drug proceeds through a series of currency deliveries at the instruction of Colombian money brokers who work for the Colombian narcotics trafficking cartels.

5. The Black Market Dollar Peso Exchange ("BMDPE") as the term is used here, is a community of currency exchange brokers operating outside the established banking system in South America. These brokers facilitate the exchange of proceeds from the sale of narcotics for local currencies or other forms of negotiable instruments, bypass the banking systems within their countries, avoid the scrutiny of the authorities, and deal directly with drug traffickers who wish to sell United States obtained narco-dollars. This underground financial system allows for the evasion of reporting and record keeping requirements mandated by the Bank Secrecy Act (31 U.S.C. § 5311 *et. seq.*) as well as Colombian foreign exchange and import laws and tariffs. The system works, in part, as follows:

   a. Colombian narcotics cartels export narcotics to the United States where they are sold for U.S. dollars. In Colombia, the cartels contact a third party -a peso broker- to launder their drug money. The peso broker enters into a "contract" with the Colombian cartel wherein he agrees to exchange pesos he controls in Colombia for currency the cartel controls abroad. Once this exchange occurs, the cartel has effectively laundered its money and is out of the BMDPE process. The peso broker, on the other hand, must now launder the currency he has accumulated abroad.

   b. The peso broker uses contacts to place the drug cash he purchased from the cartel into the banking system. The peso broker, still operating in Colombia, now has a pool

2

of narcotics-derived funds to "sell" to seemingly "legitimate" Colombian importers and investors.

    c.    Colombian importers place orders for items and make payments through the peso broker. Again, the peso broker uses contacts to purchase the requested items from manufacturers and distributors. The peso broker pays for these goods using a variety of methods.

    d.    The purchased goods are shipped and then smuggled or otherwise fraudulently entered into Colombia. The Colombian importer takes possession of his goods, having avoided paying Colombian import and exchange tariffs, pays the peso broker for the items with Colombian pesos. The peso broker, who has made his money charging both the cartels and the importers for his services, uses those new pesos to begin the cycle once again.

    6.    The area of Miami-Dade County, Florida is well-known to law enforcement as a major drug source and money laundering center involving Colombian drug trafficking organizations and associated Colombian money brokers. It is also well-known to law enforcement that these money brokers and their U.S. based agents utilize what is commonly known as a "cell" system to launder the proceeds of drug trafficking. The "cell" system keeps the movement of drug money separate from the actual movement of drugs, utilizing a series of individuals otherwise unknown to each other by the use of cell phones, beepers and codes. The system is set up to conceal or disguise the nature, source, ownership, and control of illegal drug proceeds by providing secure movement for the laundering of such currency.

7. Utilizing the Colombian BMDPE, drug traffickers in Colombia are able to sell their illegal cash proceeds while the cash still remains in the United States. When pesos are paid by associated money brokers to the drug traffickers in Colombia, the money brokers or their intermediaries are given control of the illegal cash in the United States. Latin American businessmen who have outstanding debts in the United States then purchase the cash for pesos from these money brokers, although the businessmen never actually take possession of the cash. Instead, the money brokers direct their U.S. based agents to deliver the cash according to instructions supplied by the businessmen, usually to businesses or persons located in Florida. Hence, the "cell" system has been developed over the years as a clandestine method for facilitating the movement of such illegal drug cash.

8. The totality of the circumstances surrounding the events leading to the seizure of the defendant currency is entirely consistent with the activity of a money laundering "cell" system as described above, is inconsistent with any form of legitimate business activity, and when viewed in the light of law enforcement expertise, can only be attributable to the illegal activity described below.

**SPECIFICS OF THE UNDERLYING TRANSFER**

9. On September 2, 2003, agents from the Internal Revenue Service, Criminal Investigations ("IRS-CI") and detectives assigned to the Miami Task Force (hereinafter "the agents") were conducting surveillance in the area of SW 24th Street and SW 79th Avenue. At approximately 10;30 a.m., the agents observed a white Lincoln Aviator, tag number V47WPB, driven by John Rivera ("Rivera"). Rivera met with an unknown male who drove

a silver Mazda 626, Florida tag number U41NGL and delivered a package later confirmed to have contained sixty thousand ($60,000.00) dollars in United States currency.

10. Approximately fifteen minutes later, at the Texaco station located at SW 24th Street and 77th Avenue, the agents observed Rivera meeting with another Latin male, later identified as Luis Manuel Rodriguez ("Rodriguez"). Rodriguez drove a red Firebird, Florida tag number V43END. Rodriguez exited the Firebird empty handed and joined Rivera in the Lincoln Aviator on the passenger side. Shortly thereafter, Rodriguez exited the Lincoln Aviator carrying a white plastic bag later identified as containing ten thousand twenty ($10,020.00) dollars in United States currency. He left the area in the red Firebird. At that time, the surveillance team split and one team followed Rodriguez in the red Firebird and the other team followed Rivera in the Lincoln Aviator.

11. The agents followed Rodriguez to the parking lot of a real estate school located at SW 79th Avenue and Coral Way. There the agents approached Rodriguez who was joined shortly by his girlfriend, Luz Maria Castro ("Castro"), and questioned them about the package Rodriguez had received from Riviera at the Texaco station that morning.

12. According to Rodriguez and Castro, Castro had received a call from an unknown Latin male earlier that morning who told her he had a package for her. Castro instructed the unknown male to deliver the package to her boyfriend, Rodriguez at a place to be arranged. Based on Castro's instructions, Rodriguez called the unknown male and arranged to meet him at the Texaco station at SW 77th Avenue and 24th Street.

13. Neither Castor nor Rodriguez have money remitter nor money transport license. A narcotic K-9 alerted positively to the presence of narcotics odor emanating from

the currency. The currency was seized and was transported by the agents to the office for safe keeping and subsequently transported to the Bank for processing.

14. The other team of agents continued to follow Rivera to the following locations: First to the apartment 10 at the Oasis Apartments, 7490 SW 152nd Avenue. From there, Riviera went to the Western Union located on 15166 SW 72nd Street and returned to the Oasis Apartment. At approximately 11:55 a.m. Riviera left the apartment accompanied by a Latin female later identified as Claudia Patricia Gonzalez ("Gonzalez"). Riviera carried two packages, one being a large white box which he placed in the Aviator.

15. The agents followed the Aviator with Riviera and Gonzalez to an apartment located at 13355 SW 58th Terrace #6, Miami where Riviera delivered currency later determined to be $26,000.00 to an occupant of the apartment.

16. After leaving that location, the agents followed Riviera and Gonzalez in the Aviator to Copy Systems International, a business located at 2791 NW 82nd Avenue, Miami where the agents observed Riviera delivering currency in a Froot Loops cereal box concealed inside a plastic bag. It was later determined that Riviera delivered currency in the amount of $40,000.00 to that location.

17. After leaving Copy Systems, the agents continued following Riviera and Gonzalez to a business, Aqua Depot, located at 6947 NW 82nd Avenue where Riviera was attempting to make another currency delivery. The currency, later determined to be $50,030.00, was concealed in a Passarela shoe box inside a yellow plastic. $50,000.00 was handwritten on the cover of the box.

18. At that time, the agents asked, and Riviera gave his consent for them to search the Aviator. Inside the vehicle were:
   a. a facsimile document which appeared to be currency delivery instructions. Handwritten on that documents were names, telephone numbers, addresses, and amounts. The document is attached hereto as Exhibit "A."
   b. a tan plastic bag with an empty Froot Loops cereal box on which was handwritten the number "40" and a large Special K cereal box.

19. A narcotic detecting K-9 which later arrived on the scene alerted positively to the presence of narcotics order emanating from both cereal boxes found in the Aviator, the Passarela shoe box in which was contained the $50,030.00 in United States currency. The K-9 is trained to alert to the odor of several narcotic drugs, including cocaine, marijuana and heroin.

20. The agents questioned Riviera about the facsimile document and he admitted that he had made currency deliveries in the amounts indicated and to the addresses identified in the document. Specifically he admitted making the following deliveries earlier that morning:

   a. $60,000.00 in U.S. currency to an unknown male near the Texaco station located at SW 24th Street and 77th Avenue;
   b. $10,000.00 in U.S. currency to an unknown male driving a red Firebird at the Texaco station located at SW 24th Street and 77th Avenue;
   c. $50,000.00 in U.S. currency to an unknown male at a parking lot in Doral off of NW 36th Street and 97th Avenue;
   d. $30,000 in U.S. currency to an older woman at 13355 SW 58th Terrace, Apt. 6, after he picked up the faxed ledger from the Western Union near the Oasis Apartments.
   e. $40,000.00 in U.S. currency to an unknown woman at a business located at 2791 NW 82nd Avenue;
   f. $20,000.00 in U.S. currency to an unknown male earlier that morning after he left his residence in Miami Lakes;

 g. He was attempting to deliver $50,000.00 to Aqua Depot, located at 6947 NW 82nd Avenue when he was stopped by the agents.

21. Based on the information and descriptions provided by Riviera, the agents contacted individuals at Copy Systems where $40,000.00 in currency was delivered, and the residence located at 13355 SW 58th Terrace, Apartment # 6, from where the defendant currency in this case was seized.

22. At approximately 1:55 p.m. agents arrived at 13355 SW 58th Terrace, Apartment # 6, and made contact with the resident, Silvia Navas De Ortiz ("Ortiz"). The agents identified themselves as law enforcement officers and Oritz invited them inside.

23. The agents asked her if she had received a large amount of currency earlier that day. Ortiz provided the following information:

 a. Her eldest daughter, Martha Natalia Ortiz lives in Medellin, Colombia with her husband Raul Valencia. Her daughter was staying at the apartment with her for a few days to take care of personal business.

 b. Her daughter had left the apartment earlier that morning to do some shopping, but before she left, told Ortiz that someone would be stopping by the apartment to drop off some money.

 c. At approximately 12:00 that afternoon, she received a phone call from an unknown individual who stated that he had a package for Raul. The caller advised her that he was in the complex but could not find the address he was given (13385 SW 58th Terrace). Ortiz stepped outside her apartment and waived down the individual who was driving a white sport utility vehicle. According to Ortiz, the individual was a young Colombian male accompanied by a female. The individual gave her the currency in a blue plastic "Gap" bag with white writing and pull strings.

 d. The Colombian male told her that the package contained $30,000 and left immediately. She took the bag with the money inside and hid it inside a laundry basked in the dining room area of the residence.

24. She retrieved the bag and gave it to the agents. The agents replaced the bag with the currency inside the laundry basket. Later, a narcotic detecting K-9, which later

8

arrived on the scene, alerted positively to the presence of narcotics order emanating from in United States currency. The K-9 is trained to alert to the odor of several narcotic drugs, including cocaine, marijuana and heroin.

25. The currency was seized and was transported by the agents to the office for safe keeping. The defendant currency was subsequently transported to the Bank for processing.

26. Neither John Riviera, Silvia Navadas De Ortiz or Raul Valencia are registered with the State of Florida as currency exchangers or brokers.

27. Raul Valencia has made a claim for the defendant currency in this cause, thus requiring the filing of this judicial forfeiture action. No claim was received from John Riviera the courier who delivered the currency, Silvia Navadas De Ortiz, from whom the currency was seized nor her daughter, Martha Natalia Ortiz.

## FORFEITURE ALLEGATIONS
## COUNT I (PROCEEDS)

28. Plaintiff realleges paragraphs 4 through 22 above as if fully set forth herein.

29. Based on the foregoing, the defendant currency constitutes monies furnished or intended to be furnished in exchange for controlled substances in violation of Title 21, United States Code, Section 801, et seq. or proceeds traceable thereto, and is thereby forfeit to the United States pursuant to Title 21, United States Code, Section 881(a)(6), as amended by the Civil Asset Forfeiture Reform Act of 2000, Title 18, United States Code, Section 983.

## COUNT II (FAILURE TO FILE)

30. Plaintiff realleges paragraphs 4 through 22 above as if fully set forth herein.

31. A person who engages as a business in dealing in or exchanging currency is defined as a "currency dealer or exchanger" pursuant to 31 CFR 103.11(f). A "currency dealer or exchanger" or "a person engaged in the business of transmitting funds" is a "domestic financial institution" within the meaning of 31 U.S.C. 5313 and 31 CFR 103.11(I). When a "domestic financial institution" is involved in a "transaction in currency" of more than $10,000.00, it is required to file a currency transaction report pursuant to Title 31, United States Code, Section 5313(a) and the regulations promulgated thereunder. A "transaction in currency" is defined by 31 CFR 103.11(r) as a transaction involving the physical transfer of currency from one person to another.

32. Pursuant to Title 18, United States Code, Section 981(a)(1)(A), any personal property involved in a transaction or attempted transaction in violation of Title 31, United States Code, Section 5313(a), or property traceable to such property, is subject to forfeiture to the United States.

33. Based on the foregoing, the defendant currency constitutes property involved in a transaction or attempted transaction in violation of Title 31, United States Code, Section 5313(a), or is traceable to such property, and is thereby forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A), as amended by the Civil Asset Forfeiture Reform Act of 2000, Title 18, United States Code, Section 983.

## COUNT III (MONEY LAUNDERING)

34. Plaintiff realleges paragraphs 4 through 22 above as if fully set forth herein.

35. A "financial transaction" is defined in Title 18, United States Code, Section 1956 to mean a "transaction" which in any way or degree affects interstate or foreign commerce and involves the movement of funds by wire or other means or involves one or more "monetary instruments." The term "monetary instrument" means the coin or currency of the United States or any other country, checks, personal checks, bank checks, and money orders. The term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery or other disposition, by whatever means effected.

36. Title 18, United States Code, Section 1956(a)(1)(B)(I) - (ii) prohibits any person, knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, to conduct or attempt to conduct a financial transaction which in fact does represent the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such specified unlawful activity, or to avoid a reporting requirement under State or Federal law.

37. Pursuant to Title 18, United States Code, Section1956(7)(a), the term specified unlawful activity" means any act constituting an offense listed in Title 18, United States Code, Section 1961(1).

38. Included as a predicate offense listed in Title 18, United States Code, Section 1961(1)(D) is any offense involving the felonious manufacture, importation, receiving,

concealment, buying, selling, or otherwise dealing in a controlled substance punishable under any law of the United States.

39.     Pursuant to Title 18, United States Code, Section 981(a)(1)(A), any personal or real property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956, or property traceable to such property, is subject to forfeiture to the United States.

40.     Based on the foregoing, the defendant currency constitutes personal property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i)-(ii), or is traceable to such property, and is thereby forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A), as amended by the Civil Asset Forfeiture Reform Act of 2000, Title 18, United States Code, Section 983.

WHEREFORE, the United States of America prays that process issue to bring the defendant currency within the jurisdiction of this Court by warrant of arrest *in rem*; that notice issue to all parties in interest to appear upon the return day of such process and duly intervene herein by claim and plea; that the defendant currency be condemned as forfeit to the United States of America; that an order for property disposal for the same be issued according to law; all pursuant to Title 21, United States Code, Section 881(a)(6) and Title 18, United States Code, Section 981(a)(1)(A), as amended by the Civil Asset Forfeiture Reform Act of 2000, Title 18, United States Code, Section 983; and that the Plaintiff be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By: _____
LORNETTE A. REYNOLDS
ASSISTANT U.S. ATTORNEY
99 N.E. 4th Street, 7TH Floor
Miami, Florida 33132-2111
Tel. (305) 961-9294
Fax: (305) 536-7599
Fla. Bar No. 0053955



① ⑥ ... 60  → ojo. ya te lo di
P:  por telefono. una ve
D: Hermano

② ⑥ 3445538  10  → ojo. ya te lo di
P: Luci  por teli.
D: Dixon

③ ⑤ 4901229  50  → ojo. ya te lo di.
P: Joupe.  por telefono. una u
D: Key

④ ⑤ 3851327  30  13385 SW 58 Terrace
P: Mario  #6
D: Raul

⑤ ⑤ 5999913  50  6947 NW 82 Ave
P: Pedro del Corto  1PM.

⑥ ⑥ 4262242  20
P: Fovio
D: Juan.

⑦ ⑤ 9928371  40  279 NW 82 Ave
   4680120  office sistem
P: Abuono.
D: Novio.

Favor. no salir con el amigo hasta no terminar
Te envio la siguiente lista de fax a las 4:00 PM
Si le pasa borrogo me llama           Mias.

Fuente



GOVERNMENT EXHIBIT
CASE NO.
EXHIBIT NO. A

## **VERIFICATION**

I, Ronnie Sullivan, Special Agent with the Internal Revenue Service hereby declare under penalty of perjury as provided by Title 28, United States Code, § 1746, that the foregoing Complaint for Forfeiture In Rem is based upon information known to me, and that the facts alleged therein are true and correct to the best of my knowledge and belief.

EXECUTED, on this 19th day of December, 2003.

_____
RONNIE SULLIVAN, SPECIAL AGENT
INTERNAL REVENUE SERVICE

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

03-23396

## I. (a) PLAINTIFFS
UNITED STATES OF AMERICA

## DEFENDANTS
TWENTY SIX THOUSAND DOLLARS, ($26,000.00) IN UNITED STATES CURRENCY

CIV-LENARD

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

MAGISTRATE JUDGE
SIMONTON

DADE 03cv23396 JAL

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
LORNETTE A. REYNOLDS, AUSA
United States Attorneys Office
99 NE 4th Street, 7th Floor, Miami, Florida 33132
(305) 961-9294

ATTORNEYS (IF KNOWN)

(d) CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 U.S. Government Plaintiff
- ☐ 2 U.S Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | B☒ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | A PROPERTY RIGHTS | B☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | PERSONAL PROPERTY | B☐ 640 R.R & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | B☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | B☐ 690 Other | B SOCIAL SECURITY | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | A LABOR | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| A REAL PROPERTY | A CIVIL RIGHTS | PRISONER PETITIONS | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | HABEAS CORPUS: | ☐ 790 Other Labor Litigation | FEDERAL TAX SUITS | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | B☐ 530 General | | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | A☐ 791 Empl. Ret. Inc. Security Act | A☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions A OR B |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL UNLESS DIVERSITY.)

LENGTH OF TRIAL
via __3__ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____ DOCKET NUMBER _____

DATE  12-24-03

SIGNATURE OF ATTORNEY OF RECORD
LORNETTE A. REYNOLDS, AUSA  /s/ Lornette A. Reynolds

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____